986 So.2d 724 (2008)
Zandrea JOHNSON
v.
Bobby SPURLOCK.
No. 07-CA-949.
Court of Appeal of Louisiana, Fifth Circuit.
May 27, 2008.
Writ Denied July 25, 2008.
*725 Roy J. Rodney, Jr. John K. Etter, Attorneys at Law, New Orleans, Louisiana, and Christine M. Mire, Attorney at Law, Lafayette, Louisiana, for Plaintiff/Appellant.
R. Scott Buhrer, Attorney at Law, Metairie, Louisiana, for Defendant/Appellee.
Panel composed of Judges EDWARD A. DUFRESNE, JR., THOMAS F. DALEY, and FREDERICKA HOMBERG WICKER.
FREDERICKA HOMBERG WICKER, Judge.
This is a child relocation dispute. Zandrea Johnson-Rayford[1] appeals the trial court's judgment ordering her to return B.S.,[2] her six-year-old child, to the State of Louisiana from Memphis, Tennessee. Before Hurricane Katrina struck on August 29, 2005, B.S. had lived her entire life in the New Orleans area. Mr. Bobby Spurlock, the father, lives in Kenner, Louisiana. There is a six-hour drive from Memphis to Kenner. The trial judge granted Mr. Spurlock's opposition to Mrs. Johnson-Rayford's relocation to the State of Tennessee with their minor child. For the reasons that follow, we affirm.

PROCEDURAL HISTORY AND UNDERLYING FACTS
The events that gave rise to the relocation proceeding are as follows. B.S. was born to Zandrea Johnson (now Johnson-Rayford) and Bobby Spurlock. In 2003, when B.S. was three, Mrs. Johnson-Rayford filed a petition for joint custody. In June 2005, the trial judge conducted a two-day custody hearing. At the conclusion of the hearing, the trial judge, among other rulings, granted joint custody. But before the trial judge signed a written judgment, Mrs. Johnson-Rayford filed a motion for new trial. The judge rendered a written judgment in July 2005. In pertinent part, he awarded the parents joint custody with equal physical custody of the minor child.
The trial judge orally denied the motion for new trial on August 25, 2005.[3]
Hurricane Katrina struck the New Orleans area at the end of August 2005. Mrs. Johnson-Rayford evacuated with B.S., who was in her physical custody at the time. She ultimately evacuated to Tennessee.
In October 2005, Mr. Spurlock filed an emergency rule, which sought, among other things, the immediate return of the minor child to the jurisdiction of the court. In response, Mrs. Johnson-Rayford filed a motion to allow for the temporary removal of the child to Memphis, Tennessee. The matter was heard in November 2005. In *726 December 2005, the trial judge rendered a judgment in favor of the mother.
On December 15, 2005, the court conducted a hearing at which time the parties entered into a consent judgment. They agreed to schedule visitation that would go through the end of that school year if the child remained in Memphis, Tennessee. Both parties were present in court and agreed to the stipulated terms of the visitation. The court accepted the stipulations and entered a judgment on December 21, 2005. The parties entered into the consent judgment reserving their rights with respect to an application for writs that was filed December 15, 2005 from the December 2, 2005 judgment.
In the consent judgment, it was ordered that the exchange of the child for visitation would occur at a mutually agreeable location in Jackson, Mississippi at 7:00 p.m. It was further ordered that the father might exercise additional visitation in Memphis upon seven days notice to the mother. It was ordered that reasonable telephone contact between the parent not in physical custody of the child be provided.
Mr. Spurlock took a supervisory writ from the judgment denying his motion to return the child to this jurisdiction. On December 28, 2005, this court denied the writ. The court stated: "[W]e cannot say that the trial court erred in ruling that the relocation statutes did not apply to the facts of this case as they currently exist, and that it would not be in the best interest of the minor child to remover [sic] her from her current location and school, and to return her to the New Orleans area at this time." Johnson v. Spurlock, 05-995 (La.App. 5 Cir. 12/28/05) (unpublished writ disposition).
In April 2006, Mrs. Johnson-Rayford married Dr. Rayford. She filed a request for relocation of the child to Memphis, Tennessee. At the subsequent relocation hearing, she testified that her marriage played a significant role in filing the request. Other factors were her uncertainty about the post-storm conditions in the New Orleans area; the lack of suitable housing; and, the better quality of education in Tennessee.
In May 2006, Mr. Spurlock filed an objection to Mrs. Johnson-Rayford's proposed relocation of the child. The trial judge set the matter for July 11, 2006. On August 25, 2006, the trial judge rendered the judgment at issue here, which denied the relocation of the minor child. On September 7, 2006, the mother filed a motion to amend the judgment or for new trial, which was ultimately denied.
Before the move, B.S. had a close, long-term, stable relationship with the following persons who remain in the New Orleans area: her father, Ms. Olivia Coleman (Mr. Spurlock's grandmother), Gwendolyn Spurlock (Mr. Spurlock's sister), B.S.'s paternal cousins (Gwendolyn's children), and Mr. Marshall Self[4] (Mrs. Johnson-Rayford's father). She also had such a relationship with her mother. Mrs. Johnson-Rayford and her husband, however, are the only persons residing in Tennessee. According to Mr. Self, he has a niece who lives in Memphis. But, Mrs. Johnson-Rayford does not know the niece. Mrs. Johnson-Rayford testified that New Orleans is her home town. She has relatives and friends residing in the New Orleans area.
B.S. attended school in the New Orleans area before the move. During 2004-2005, *727 she attended Louise S. McGehee School. She had been enrolled at McGehee for the next school year. But the hurricane struck on August 29, 2005 and she had only attended McGehee a few days that school year.
Mrs. Johnson-Rayford testified that after researching schools in the area for more than a year before enrolling B.S., she decided to send B.S. to McGehee. B.S., however, attended St. Mary's Episcopal in Tennessee during the 2005-2006 school year.

DISCUSSION

STANDARD OF REVIEW
"The relocating parent has the burden of proof that the proposed relocation is made in good faith and is in the best interest of the child." La.R.S. 9:355.13. "In determining the child's best interest, the court shall consider the benefits which the child will derive either directly or indirectly from an enhancement in the relocating parent's general quality of life." Id.
La.R.S. 9:355.12 requires the court to consider certain enumerated factors.
Although the statute mandates that all of the factors be considered by the court, it does not dictate preferential consideration of certain factors. Curole v. Curole, 02-1891 (La.10/15/02), 828 So.2d 1094, 1097.
The appellant assigns errors regarding the trial judge's factual findings. She argues that he incorrectly and inadequately applied the pertinent law. Because we find as appellant asserts that the trial judge failed to consider the pertinent relocation statute, we pretermit a discussion of arguments regarding any inadequacy in otherwise applying the applicable law or any alleged error in the trial judge's factual determinations.
In this case, the trial court ignored the relocation statute and instead relied on the "best interest" factors for awarding custody in La.C.C. art. 134.[5]
"It is well-settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of `manifest error' or unless it is `clearly wrong.'" Evans v. Lungrin, 97-0541 (La.2/6/98), 708 So.2d 731, 735 (citing Rosell v. ESCO, 549 So.2d 840, 844 (La.1989)). But "where one or more trial court legal errors interdict the fact-finding process, the manifest *728 error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent de novo review of the record and determine a preponderance of the evidence." Id. (citation omitted).
"A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial." Id. (citation omitted). Prejudicial legal errors occur "when they materially affect the outcome and deprive a party of substantial rights." Id. (citation omitted). "When such a prejudicial error of law skews the trial court's finding of a material issue of fact and causes it to pretermit other issues, the appellate court is required, if it can, to render judgment on the record by applying the correct law and determining the essential material facts de novo." Id. (citation omitted).
In this case, the record does not support a finding that the trial court actually considered each La.R.S. 9:355.12 relocation factor. Thus, the trial court committed prejudicial legal error that materially affected the outcome and deprived a party of substantial rights. But this failure does not mandate a reversal on that ground alone. The appellate court may remedy the deficiency via a de novo review, which we will undertake in the instant case, factor by factor, based on the evidence in the record. See: H.S.C. v. C.E.C., 05-1490 (La.App. 4 Cir. 11/8/06), 944 So.2d 738, 743. Preliminarily, however, we address the recusal and evidentiary issues.

RECUSAL
Two days after denying the motion for new trial but before Mrs. Johnson-Rayford filed her motion for appeal, the trial judge issued an ex parte order recusing himself. In essence, the trial judge stated his belief that the parties were unable to receive the benefit of a fair and impartial jurist. In a reply brief, Ms. Johnson-Rayford's counsel included a footnote asking this court to render a judgment vacating some of the trial judge's comments. The appellant does not seek to vacate the recusal judgment nor does she argue that the trial judge erred in recusing himself. Instead, the appellant argues generally that the court of appeal shall render any judgment which is just, legal and proper upon the record. But the appellant cites neither statutory nor jurisprudential authority for this court to conduct a de novo review of the recusal order and to make a factual determination as to whether the trial judge's comments should be stricken. Therefore, we decline to do so.
To the extent that the appellant suggests that the trial judge might have been biased in deciding the relocation issue, any alleged bias regarding his judgment is irrelevant since this court is conducting an independent, de novo review of the relocation judgment. Furthermore, in his motion and order for recusal, the trial judge stated reasons why the parties could "no longer" receive the benefit of a fair and impartial jurist. Thus, it is clear that it was only after he rendered the relocation judgment and the denial of the motion for new trial that events occurred whereby he believed that he could no longer function fairly. A judge is presumed to be impartial. Bias or prejudice must be of a substantial nature and based on more than conclusionary allegations. Couvillion v. Couvillion, 00-143 (La.App. 5 Cir. 9/26/00), 769 So.2d 747, 753, writ denied, 00-3185 (La.1/12/01), 781 So.2d 562 (citations omitted). As such, the appellant has not demonstrated that the trial judge was biased or impartial during the proceedings that are now before this court.

*729 EVIDENCE
Mrs. Johnson-Rayford assigns as error the trial judge's failure to take the child's preference into consideration. Since we are conducting a de novo review, we pretermit a discussion of this argument. In a related argument, however, appellant states the trial judge denied her request for psychological evaluations to determine any stated preference of the child. She also mentioned that the court further precluded the parties from testifying as to any preference the child expressed on the basis it was hearsay. Appellant did not, however, brief these assignments on appeal. According to Rule 2-12.4 of the Uniform Rules  Courts of Appeal, all specifications or assignments of error must be briefed and the appellate court may consider as abandoned any specification or assignment of error that has not been briefed. Accordingly, we find that these assignments of error have been abandoned by appellant, and we will not consider the merits of these allegations. Silbernagel v. Silbernagel, 06-879 (La.App. 5 Cir. 4/11/07), 958 So.2d 13, 20.
Furthermore, at the time of trial B.S. was six. We note that appellant did not seek to offer the child's testimony into evidence nor have the court interview the child in chambers. Still, the record indicates that some evidence of the child's preference was before the court. Based on the testimony of the witnesses, we can deduce what her reaction to the relocation would be.

GOOD FAITH
We find that Mrs. Johnson-Rayford's proposed relocation was made in good faith. La.R.S. 9:355.13. Her primary reason for relocating was because she recently married and her husband is employed in Tennessee. She moved into a house where he is presently located.

THE FACTORS
La.R.S. 9:355.12 requires the court to consider the following factors:[6]
A. In reaching its decision regarding a proposed relocation, the court shall consider the following factors:
(1) The nature, quality, extent of involvement, and duration of the child's relationship with the parent proposing to relocate and with the nonrelocating parent, siblings, and other significant persons in the child's life.
(2) The age, developmental stage, needs of the child, and the likely impact the relocation will have on the child's physical, educational, and emotional development, taking into consideration any special needs of the child.
(3) The feasibility of preserving a good relationship between the nonrelocating parent and the child through suitable visitation arrangements, considering the logistics and financial circumstances of the parties.
(4) The child's preference, taking into consideration the age and maturity of the child.
(5) Whether there is an established pattern of conduct of the parent seeking the relocation, either to promote or thwart the relationship of the child and the nonrelocating party.
(6) Whether the relocation of the child will enhance the general quality of life for both the custodial parent seeking the relocation and the child, including but *730 not limited to financial or emotional benefit or educational opportunity.
(7) The reasons of each parent for seeking or opposing the relocation.
(8) The current employment and economic circumstances of each parent and whether or not the proposed relocation is necessary to improve the circumstances of the parent seeking relocation of the child.
(9) The extent to which the objecting parent has fulfilled his or her financial obligations to the parent seeking relocation, including child support, spousal support, and community property obligations.
(10) The feasibility of a relocation by the objecting parent.
(11) Any history of substance abuse or violence by either parent, including a consideration of the severity of such conduct and the failure or success of any attempts at rehabilitation.
(12) Any other factors affecting the best interest of the child.
B. The court may not consider whether or not the person seeking relocation of the child will relocate without the child if relocation is denied or whether or not the person opposing relocation will also relocate if relocation is allowed.

Factors 1, 3, 4, 5, 6, 8, and 10
The following testimony was adduced as to Factor 1 (relationships), Factor 3 (feasibility of preserving good relationship between nonrelocating parent and child through suitable visitation), Factor 4 (child's preference), Factor 5 (thwart relationship), Factor 6 (relocation enhancing general quality of life), Factor 8 (current employment and economic circumstances), and Factor 10 (feasibility of relocation by objecting parent).
Mr. Spurlock testified he is an African-American male who is a manager of a car dealership. Few African-Americans hold this position in Louisiana. He earned approximately $160,000 in 2005. It would be difficult for him to make this income in Tennessee. His income is based on his experience in this area as well as his contacts. Also, his family lives here, and there is no reason for him to relocate.
Mrs. Johnson-Rayford testified that she is a registered nurse. Before Hurricane Katrina, she worked full-time as a registered nurse in New Orleans. She made approximately $3,800 per month. At the time of the hurricane, she was working full-time at the Cannon Hospice in New Orleans. She had worked for another hospice before Cannon. She stated that her husband was laid off from his employment here and he is earning less now than he did when he was in New Orleans. But since she has relocated to Memphis, her financial circumstances have improved. As such, she no longer works a full-time job. She is earning less now than she was before the hurricane. But she views her reduced work schedule as a benefit for the child because she is able to participate more fully in her child's life.
When asked whether she looked for employment in New Orleans since Katrina, she responded that since Katrina she has not filled out a job application. But a few weeks before the hearing, she spoke to people, including former employers. She did not, however, indicate whether the job market was such that she could not find suitable or comparable employment in this area. Additionally, she testified that she attended a real estate class in Memphis. She did not indicate, however, that she would be precluded from attending such classes in this area.
Mrs. Johnson-Rayford testified that after the storm, she felt uncertain about the *731 city. Moreover, they could not find a place to live. So, they relocated to Tennessee. She admitted, however, that since the December 2, 2005 hearing she had made no attempt to find suitable housing for herself and B.S. in the New Orleans area.
Dr. and Mrs. Rayford own investment property in this area. Mrs. Johnson-Rayford's residence was damaged by the hurricane and it is still in poor condition as depicted by the photographs that were introduced into evidence.
Dr. Rayford, however, also resided here before the hurricane. He lived in Gretna in Lake Timberlane. That house has undergone repair but Dr. Rayford had not yet seen the final repairs.
When asked if there was anything that precluded her, the child, and her husband from residing in the Lake Timberlane residence, Mrs. Johnson-Rayford replied it was still being repaired. Furthermore, Dr. Rayford is not employed here. He was laid off from his employment here. Prior to the marriage, her husband had a job in Memphis with an employment contract. She was unsure of the date the contract was signed.
Dr. Rayford testified that none of the investment properties compare with the Memphis house in size, quality, and community-type. When asked about the home in Gretna, he replied that before the hurricane, it was comparable. After Katrina, he has not lived there and he would have some reluctance to have his family in that home.
Mr. Spurlock testified that neither his house nor the neighborhood flooded as a result of the hurricane.
Mr. Self testified that he has been to Dr. Rayford's house in Gretna. It is a big house in a nice community. Mr. Self has also been to Mr. Spurlock's house, which is in a nice neighborhood in Kenner. He has been there since the hurricane. The house appears to be in good condition. He also visited Mrs. Johnson-Rayford in Tennessee. Mr. Self did not believe the child was lacking anything at her father's home but he felt that she has more in Memphis.
Mrs. Johnson-Rayford testified that she thought B.S. has adjusted to the move. B.S. likes her house, school, environment, and activities. Both before and after the storm, B.S. has been a happy and well-adjusted child. Mrs. Johnson-Rayford believes that the father has a loving and caring relationship with the child. B.S. has never said that she does not look forward to seeing her father in New Orleans.
Mr. Self testified that Mr. Spurlock and B.S. have a very close and loving relationship. The child has an equal attachment to both parents. Based on his observations, B.S. appears to enjoy spending time with both of her parents.
Mr. Spurlock testified that he and his daughter have a great relationship. He has been there for her since the day she was born. B.S. looks forward each time she visits her father and her family in this area.
Mr. Spurlock stated that his job allows him a flexible schedule, which permitted him to participate in B.S.'s activities. Before the hurricane, he had B.S. every Tuesday and Wednesday and every other weekend. He has always been involved in the child's life. Dr. Rayford recalled that before the hurricane the father was in fact having the child an equal amount of time as the mother.
Mrs. Johnson-Rayford testified that the majority of the time she has provided transportation for the child's visits with the father. She did so because Mr. Spurlock *732 was late in arriving at the meeting point.
She stated that she visited here the weekend of the wedding. B.S., however, was involved in the wedding. This was probably the only time that B.S. did not see B.S.'s father when they were here. Otherwise, each time they visited, the child always spent nights with the father's family. Even the weekend of the wedding, "they" knew they were here. B.S. Has been in this area "many" times since December 2, 2005. Also, Mr. Spurlock is free to visit B.S. in Memphis. She has not, however, invited Mr. Spurlock to visit B.S. in Memphis. In addition, as far as she knew, Mr. Spurlock never sought to do so.
Still, she did not believe that the relocation to Memphis would be harmful to B.S.'s relationship with her father. She thought that B.S. still had the opportunity to spend a good deal of time with Mr. Spurlock. She is willing to give Mr. Spurlock as much time as possible, such as on school holidays. She is willing to provide for visitation for the father throughout the entire summer except that she would want some time to take B.S. on vacation. She is willing to allow B.S. to share visitation on her birthday and Christmas.
Mr. Self testified he is involved in transporting the child back-and-forth between New Orleans and Memphis. He was asked how frequently his daughter and the child visited with him in New Orleans since January of that year. He said it might have been three times. One of these times was when his daughter got married.
Mr. Spurlock denied that Mrs. Johnson-Rayford allowed him to see the child on numerous occasions. Further, she never gave him advance notice. He found out from others that the child was here. He stated he arrived late at the meeting point once because of rain.
He stated that he communicates with B.S. by phone. However, his ability to do so has diminished since the hurricane. He explained that his only form of communication with B.S. is to either call the child's cell phone or to call the mother. He has been frustrated in his attempts to speak to her at times because he got no answer or return call.
Mr. Self testified that he does not see the child as much as when she lived in New Orleans. But he believes the quality of his relationship with B.S. has not changed since the move. He is retired and is able to visit her every two weeks.
Mrs. Johnson-Rayford stated that when they lived in New Orleans, Mr. Self probably saw B.S. almost every day. She did not believe the relationship suffered after the move because he sees the child several times a month.
Mr. Spurlock, however, testified that Ms. Coleman, his grandmother, with whom B.S. also has a close relationship, does not drive. Mrs. Johnson-Rayford testified that Ms. Coleman has not been to Memphis to see her. She thought that Ms. Coleman still saw B.S. a good bit of time because each time she is in New Orleans the child is there.
Mrs. Johnson-Rayford testified that she has attempted to maintain B.S.'s significant relationships. Whenever she is in New Orleans she brings her to see Mr. Spurlock's family members even when it is not their visitation time. She allows the child to sleep there. She maintains telephone contact. Even during the time when she had not spoken to Mr. Spurlock, she still had contact with his sister.
Mr. Spurlock testified that the distance now strains his relationship with B.S. Before the evacuation, he was present at school for various activities. He attended parent-teacher conferences. When he had *733 physical custody, he picked her up and dropped her off. Mr. Self testified that when he was at the child's school, he saw Mr. Spurlock there. Mr. Self did not go to parent-teacher conferences. So, he did not know whether the father was present.
According to Mr. Spurlock, he no longer is able to help with B.S.'s homework as he did before her move. He had been involved in her life since the day she was born. Moreover, B.S. no longer has his family's support as she did before the move. He believes the nature, quality, and extent of the child's relationship with her close family in this area will be affected by relocation to Memphis. She is sad and cries when it is time for her to leave. Each time B.S. comes in, she looks forward to visiting her relatives.
Mrs. Johnson-Rayford testified that the father was not present for the child's extracurricular activities. Mr. Spurlock denied this. He testified that between the date of the custody judgment of June 2005 and the date the hurricane struck, he did not refuse to take the child to extracurricular activities. He took her to dance class every Saturday.
Mrs. Johnson Rayford testified that one of the reasons for relocating was because of the school. The child is in school at St. Mary's Episcopal. In her opinion, St. Mary's is a better school than McGehee School in New Orleans. A copy of the literature from that school was introduced into evidence. It provides, among other things, information regarding the student body's academic performance.
On the other hand, Mr. Spurlock testified that Mrs. Johnson-Rayford had told him that one of the reasons that McGehee was the best school was because a high percentage of girls graduated from there and went on to college.
Mrs. Johnson-Rayford testified that B.S. has performed very well at St. Mary's. She said that in terms of the teacherto child ratio that was about the same as McGehee's. The difference was that St. Mary's uses many ancillary employees for specialized teaching.
In her opinion, B.S. is doing better developmentally at Saint Mary's as compared to McGehee. Her writing is more advanced because of the type of program. The school encourages reading so that the children develop a love of reading. B.S. has developed a love of reading. The school encourages the parents to read with the children at night.
When asked if there were any other educational advantages that are present at St. Mary's which were not present at McGehee, she replied that she found the school is aware of cultural diversity. The school attempts to teach about the diversity in order to dispel racism. The school encourages the parents to know each other. She finds this is an advantage for B.S. because she is a minority student there.
Mr. Self testified that St. Mary's is a bigger school and better equipped than McGehee. B.S. has adapted to St. Mary's very well. St. Mary's is superior to McGehee. It has more to offer.
However, he testified that B.S. was happy and appeared to be well-adjusted at McGehee. Based on his observation, she did well at McGehee. He did not know what B.S.'s courses would currently be at McGehee.
Mr. Spurlock testified that McGehee is a good school. And one which would be hard with which to compete. He was referred to the mother's testimony about St. Mary's that she believed they handled diversity issues and he was asked if there was a diverse ethnic makeup at McGehee when the child was there. He replied it *734 was very diverse. He never saw any problems, or heard any complaints in terms of the child's integrating into the school body at McGehee. He thought she mixed well and liked the school. He never heard any complaints from the mother about that issue. The child performed well at McGehee according to the information the father received on the report cards.
Based on his observation of the child and her interaction with the school, he believed she liked the school. She seemed to love and look forward to going to class. He believes the child can receive a quality education at McGehee School. Last year, McGehee had various resource classes available, such as science, music, computer, Spanish, and French as at St. Mary's.
Mrs. Johnson-Rayford testified regarding her relationship with B.S. She has changed to home-care work in order to spend more time with her and to be able to bring her to school and pick her up. She never works eight hours a day. On the average, she might work four to five hours. She stresses education, and extracurricular activities. B.S. is given a variety of experiences. In terms of education, Mrs. Johnson-Rayford stated she stresses education, reading, and summer activities. She believes that she is the better parent.
But she believes that the father has a loving and caring relationship with B.S. B.S. has never said that she does not look forward to seeing her father in New Orleans. She has tried to give Mr. Spurlock as close to equal time in terms of visitation. She knows, however, that with the child being in school, this is not feasible. But she tries to make certain Mr. Spurlock sees her as much as possible.
Mrs. Johnson-Rayford stated that during the school year of 2005-2006, there were parent-teacher conferences at St. Mary's. These were in the fall in and the spring. She attended both conferences. She did not notify Mr. Spurlock about them and he did not inquire. She did not send him of a copy of the child's report card. She listed it for the school to send it but there was some confusion and he was not getting them. As soon as she found out that he was not receiving them, she immediately notified the school so that could be corrected.
Mrs. Johnson-Rayford testified that the child currently has friends in Memphis. She also has friends in New Orleans. She had friends from her class at McGehee.
With regard to differences in extracurricular activities, Mrs. Johnson-Rayford admitted that she did that know if B.S.'s Memphis activities, including gymnastics, are available in the New Orleans area since the storm.
There was testimony that both parties have difficulty communicating with the other parent, including the schedule of summer visitation. Although Mrs. Johnson-Rayford testified that she encourages visits and has communication with Mr. Spurlock's family, she admitted there are times she has not spoken to Mr. Spurlock. Mr. Spurlock testified he does not have a good relationship with the mother.
In conclusion, after considering Factors 1, 3, 4, 5, 6, 8, and 10, we find the following.
Given the above testimony, we find that factors 4 (child's preference) and 5 (thwart relationship) do not weigh heavily in favor of either party. However, we find that Factors 1, 3, 6, 8, and 10 militate in favor of the father.
We find that Mrs. Johnson-Rayford, as the relocating parent, failed to meet her burden in proving that the proposed relocation was necessary to improve her circumstances. It is speculative whether by moving from this area to Tennessee, the *735 relocation to Tennessee enabled the mother to work a lighter schedule in order to spend more time with the child. Stated differently, it is speculative whether Mrs. Johnson-Rayford could only have a reduced work schedule by moving to Tennessee. Although Mrs. Johnson-Rayford moved where her husband is living and is employed, there is no evidence that Mrs. Johnson-Rayford has made unsuccessful efforts to try to find another job in this area. Although she contacted her former employers, there is no evidence she sought to find a job with more-flexible hours that would compare to the one in Tennessee. She also failed to prove that the house in Tennessee was of such quality that it was in the child's best interest to move there rather than remain in Louisiana. Thus, she has failed to prove that the quality of the child's life in Tennessee was such that the move to Tennessee was in the child's best interest.
Mr. Spurlock's job is not portable. He does not wish to leave his family. We conclude that it is not feasible for him to relocate.
Appellant argues that there is uncontradicted evidence that St. Mary's was of superior quality based on Mrs. Johnson-Rayford's testimony. As such, appellant argues her testimony should be accepted is true. We disagree. Mr. Spurlock and Mr. Self also presented testimony on this issue. There was, however, no expert testimony evaluating the educational programs at the schools. Mrs. Johnson-Rayford based the determination on her personal knowledge that St. Mary's offered educational advantages over those available here. In examining the entire testimony, we find that Mrs. Johnson-Rayford has failed to meet her burden of proving that the Tennessee School is of such superior quality in comparison to McGehee that it would be in the child's best interest to attend school there as opposed to school in the New Orleans area.
We find that the quality of the relationship between the child and the father and other significant persons would be inhibited by the move. The move will strain the close, long-term, stable relationship with the father, who, because of the distance between the cities, can no longer participate as he once did in the child's school activities. It will also strain the relationship with B.S.'s paternal relatives who reside here.
The record indicates that the child has a positive relationship with both parents. However, the other significant persons in the child's life  maternal grandfather, paternal great-grandmother, paternal Aunt, and paternal cousins  reside in the New Orleans area. Before the mother was allowed to temporarily relocate to Tennessee on an emergency basis, B.S. enjoyed a very close and long-term relationship with her father and these significant others. The move has impaired her close relationship with the significant others. Although Mr. Self disagrees, we conclude that his time with the child has been significantly reduced. Further, unlike Mr. Self, Ms. Coleman does not drive.
Moreover, there was no evidence to support a finding that phone calls with this child would otherwise foster a continuing meaningful relationship with the father.

Factor 9 (child support obligation)
The following arguments were raised on appeal as to Factor 9.
Mrs. Johnson-Rayford argues that the record establishes that Mr. Spurlock has not consistently fulfilled his financial obligations. She relies on pleadings that were filed in the record regarding her motions for alleged child support arrearages. Mr. Spurlock's counsel also points to pleadings in the record to argue that Mr. Spurlock *736 has never willfully and intentionally failed to pay child support. In particular, he stated that Mr. Spurlock was at one time unemployed but once re-employed, he paid all arrearages. He also fell behind immediately following the hurricane because he had no income. Once again he became current on the arrearages. Finally, his employer erroneously failed to make one payment under a wage assignment. Currently no arrearages exist. And, Mr. Spurlock has never been held in contempt of court for failure to pay child support.
The record does not contain any judgment holding Mr. Spurlock in contempt for failure to pay child support. Furthermore, there was no evidence presented at the present hearing that Mr. Spurlock consistently failed to fulfill his financial obligations.
In addition to proving good faith, the parent requesting relocation has the burden of proving that the proposed relocation is in the best interest of the child. La.R.S. 9:355.13. Without more, the alleged facts do not constitute substantial competent evidence to support a finding that Mr. Spurlock consistently failed to fulfill his financial obligations.

Factor 11 (substance abuse or violence)
There is no history of domestic violence or substance abuse by either parent.

Factor 7 (reasons for seeking or opposing relocation)
As discussed earlier, the record provides a basis for finding that Mrs. Johnson-Rayford's request to relocate was made in good faith since she moved primarily due to her marriage.
Mr. Spurlock's opposition is well-founded. He loves his daughter and wants to maintain a close relationship with her by remaining actively involved in her life.
Considering Mrs. Johnson-Rayford's primary reason for moving and the father's reasons for opposing the move, we find that this factor does not weigh heavily in favor of either party.

Factor 2 (needs of child)
As previously discussed, B.S. is a well-adjusted child. We have previously discussed the child's educational development.
The following testimony was adduced regarding the child's physical needs.
According to Mrs. Johnson-Rayford, B.S. had breathing problems following her visits to this area. These episodes reportedly required medication six or seven times in the last year. But as B.S. is getting older, she has less need for the medication.
On the other hand, Mr. Spurlock stated that B.S. had not had any symptoms of asthma or breathing problems while in his care. He had not given B.S. breathing treatments in a few years or longer. He had not observed any negative health effects from the child's being in the New Orleans area since the hurricane. Mrs. Johnson-Rayford never advised him of breathing problems. Still, he took B.S. to Dr. David L. Schneider[7] to make certain her health would not be adversely affected by her return to the area.
Mr. Self testified he was unaware of B.S.'s need for medical treatment when in New Orleans. Dr. Rayford stated he has not observed anything negative about B.S.'s health since she moved to Tennessee.
Dr. David L. Schneider testified that he specializes and is board certified in allergy and immunology. He is also board certified in pediatrics. He specializes in treating asthma. During the months of March and June 2006, he saw B.S. three times.
*737 His diagnostic impression was a past history of asthma symptoms secondary to upper respiratory tract infections. Based on his exam and spirometry testing, B.S. does not have any observable signs of asthma. From the history that was given, B.S. had not had any use of Albuterol, which is an asthma rescue medication, for two to three years.
Mr. Spurlock requested mold testing for allergy. He tested the child for molds that are commonly found in the current New Orleans environment. B.S. showed no reaction to any of the molds tested. He concluded that she was not sensitized to mold. She was not at risk for developing allergic rhinitis or asthma from mold. Based on the fact that the father's home did not flood and the father was not in a flooded neighborhood, he would not have any concern about the child having an increased risk of asthma problems.
He has not seen any increase in the numbers or severity of cases of his patients suffering from asthma since the hurricane. He has encountered the same seasonal changes in terms of symptoms in asthma patients that existed before the hurricane. By history, the child's asthma issues were as a young child with respiratory infections. This was when she was a year-and-a-half or two years of age. Once she gets another infection, she may again potentially have issues and require some Albuterol. He would be willing to treat her if that situation arose. B.S. could have upper respiratory infections whether she is living in New Orleans, Memphis, or anywhere else.
He did not think the child had asthma because everything had been so quiet for her for so long. He might potentially have placed B.S. in the category that he would call asthmatic bronchitis where with infection there might be asthma but without infection she was pretty much a normal person.
When asked about the effect of exposure to school settings that might have been flooded or had mold problems, he replied that this could be a danger to all children. When asked if it would be an increased danger to a child who had a diagnosis of mild asthma, he replied that was not his diagnosis for B.S.
But assuming that B.S. has mild asthma, and she was not allergic to the tested mold, he does not have any concern about B.S. returning to the New Orleans area and living in areas that are not flooded or neighborhoods that were not flooded. If B.S. were to experience any symptoms of asthma in this city, he believes the Albuterol would be sufficient to treat those episodes. If not, he would be willing to continue to treat B.S. if she were to return to this area in the event she had any problems with asthma. If B.S. has asthma, he does not consider mold and mildew to be triggers for asthmatic attacks.
Based on the testimony, we find that Mrs. Johnson-Rayford failed to meet her burden of proving that it is in the child's best interest to move to Memphis insofar as her physical needs are concerned.

Factor 12 (other factors)
We find no other factors affecting the best interest of the child.
Based on our de novo analysis of the above twelve factors, and after weighing the factors as a whole, we find that they weigh heavily in favor of disallowing the relocation. Accordingly, we find that the mother has not borne her La. R.S. 9:355.13 burden of proving that the relocation is in the best interest of the child.

DECREE
For the reasons stated herein, the judgment of the district court is affirmed.
AFFIRMED.
DALEY, J., dissents with reasons.
*738 DALEY J., dissents with reasons.
Upon de novo review I would reverse the trial court and approve the relocation. Under R.S. 9:355.13, the relocating parent must prove the relocation is made in good faith and is in the best interest of the child. The statute further provides that the court shall consider "the benefits which the child will derive either directly or indirectly from an enhancement in the relocating parent's general quality of life." The majority agrees the relocation by Mrs. Johnson-Rayford is in good faith; in my view the relocation is in the best interest of B.S. A review of the facts indicates that while B.S. enjoyed a close relationship with her father and his family, it is clear that B.S. has lived primarily with her mother and her mother has been her primary caretaker. The testimony indicates that B.S. has adjusted to living in Tennessee and is thriving. Mrs. Johnson-Rayford's current marriage has created a stable traditional household, which will benefit B.S. The economic benefit derived from the marriage allows the mother, Mrs. Johnson-Rayford, more time to spend with her daughter, eliminating the need for B.S. to attend before and after school care programs. This has also allowed the mother the ability to more fully participate in B.S.'s activities. While the relocation clearly diminishes Mr. Spurlock's opportunity to spend time with his daughter on a weekly basis, the testimony indicates that Mrs. Johnson-Rayford is committed to maintaining the relationship between Mr. Spurlock and B.S. The testimony also indicates that Mr. Spurlock has chosen not to visit the child in Tennessee. His refusal to visit B.S. in Tennessee cannot be used against the proposed relocation. In my view, the testimony indicates that B.S. will derive both direct and indirect benefits from the enhancement in Mrs. Johnson-Rayford's quality of life due to the relocation. Therefore, I respectfully disagree with the majority.
NOTES
[1] We refer to Mrs. Johnson-Rayford by her married name.
[2] Although we are not required to use initials to insure the confidentiality of minors in relocation cases under the Uniform Rules of Louisiana Courts of Appeal Rule 5-2, we will do so here because the appellant has chosen to refer to the minor in this fashion.
[3] Appellant argues that the trial judge erred when it determined that an existing order required equal sharing because there was no final custody order in the record. Appellant bases this argument on the fact that the trial judge orally denied the motion for new trial but he did not sign a written final judgment denying the new trial. In response, appellee argues that the trial court correctly determined that the July 16, 2005 joint custody order requiring equal sharing of the child was in effect. Appellee relies on La.C.C.P. art. 3943 for the proposition that even though the judgment might not be a final judgment, that factor does not suspend its execution. We agree. Neither an appeal nor a motion for new trial suspends the finality and executory nature of custody judgments. Fontana v. Fontana, 426 So.2d 351, 355 (La.App. 2 Cir. 1983), writ denied, 433 So.2d 150 (La. 1983). Custody judgments mandate immediate efficacy. Id.
[4] Appellant refers to this witness as "Selph" but in the transcript the name is spelled, "Self."
[5] The article provides:

The court shall consider all relevant factors in determining the best interest of the child. Such factors may include:
(1) The love, affection, and other emotional ties between each party and the child.
(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.
(6) The moral fitness of each party, insofar as it affects the welfare of the child.
(7) The mental and physical health of each party.
(8) The home, school, and community history of the child.
(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
(10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.
(11) The distance between the respective residences of the parties.
(12) The responsibility for the care and rearing of the child previously exercised by each party.
[6] Appellant argues that the trial court erred by imposing a greater burden of proof on Mrs. Johnson-Rayford when it required that each parent have equal time with the child. We emphasize that our analysis only considers the factors that are enumerated in La.R.S. 9:355.12.
[7] He is also referred to as "Snider" in the record.