FREDERICKA HOMBERG WICKER, Judge.
|sIn this medical malpractice action, plaintiffs assert that the trial court committed reversible error following a trial on the merits. For the foregoing reasons, we reverse the judgment of the trial court and remand the matter to the trial court for a new trial.
PROCEDURAL AND FACTUAL HISTORY
This case is a medical malpractice action involving the death of Doris Greathouse on June 9, 2008 while she was a patient at East Jefferson General Hospital (EJGH). Ms. Greathouse, who was 80 years old at the time, was admitted to EJGH on June 2, 2008 for an elective heart surgery to treat her arterial stenosis.
With regard to the events leading up to Ms. Greathouse’s death, the following facts are undisputed. Prior to her planned surgery, Dr. Christopher Cougle and -Monica Wilkinson, a certified registered nurse anesthetist (CRNA), along with the help of an anesthesiology student resident, planned to administer general anesthesia, which required Ms. Greathouse to be intu-bated. After successfully sedating Ms. Greathouse, Dr. Cougle and CRNA Wilkinson intubated Ms. Greathouse using an Eschmann stylet.[1]
1 ¿Shortly after the endotracheal tube was inserted over the Eschmann stylet, blood began leaking from Ms. Great-house’s mouth. Ms. Greathouse suffered cardiac arrest, and her brain was deprived of oxygen for a number of minutes.[2] During this time, several other anesthesiologists were called to her operating room. Ultimately, Dr. Charles Schroeder was able to successfully ventilate Ms. Great-house shortly after he arrived in the operating room. By the time she was successfully ventilated, Ms. Greathouse’s brain had been deprived of oxygen for long enough to cause fatal anoxic brain damage. The surgery for which Ms. Greathouse was originally admitted was never performed. Following the failed intubation procedure, Ms. Greathouse was transferred to EJGH’s Intensive Care Unit, where she remained until her family ultimately elected to remove life support. Ms. Greathouse died on June 9, 2008.
In accordance with the Louisiana Medical Malpractice Act (“MMA”)[3], a Medical Review Panel was formed to evaluate the *1083 merits of the plaintiffs’ case. The Medical Review Panel found that none of the defendants breached the applicable standard of care.
The plaintiffs, Ms. Greathouse’s children,[4] filed a wrongful death and survival action, alleging that Dr. Cougle and/or Ms. Wilkinson committed medical | ¡¡malpractice in the course of conducting the anesthesia procedure, resulting in their mother’s injuries and subsequent death. Specifically, the plaintiffs alleged that the defendants breached the standard of care by injuring Ms. Greathouse’s airway, causing her lung to bleed. Further, they alleged that the defendants subsequently breached the standard of care in failing to manage the bleed in her lungs appropriately, causing her anoxic brain damage and subsequent death. Therefore, the plaintiffs alleged that the defendants, as well as their employer, Parish Anesthesia, and their insurer, Louisiana Medical Mutual Insurance Company, should be held liable for the plaintiffs’ damages.
The case ultimately proceeded to a jury trial. At trial, Dr. William Rolston testified on behalf of the plaintiffs. Dr. Rol-ston was Ms. Greathouse’s treating cardiologist at EJGH beginning in 2006. Dr. Rolston testified with regard to Ms. Great-house’s initial diagnosis and treatment for aortic valve disease. Dr. Rolston discussed Ms. Greathouse’s previous history of heart disease, which included 3-vessel coronary disease and a previous coronary artery bypass grafting. According to Dr. Rolston, Ms. Greathouse’s aortic stenosis was causing her health to rapidly deteriorate in the time leading up to her planned surgery. In the months before her death, Dr. Rolston and Ms. Greathouse discussed the various treatment options available to treat her aortic stenosis. According to Dr. Rolston, the planned surgery was “the more aggressive option,” but the surgery “would have given her a much, much better ... more normal life and clearly would have given her some longevity.” Dr. Rol-ston stated that he “thoúght that we probably could have done this surgery with, maybe, 15% risk, 85% success rate ... based upon lots of experience with the quality of surgery that is done [at EJGH].” Dr. Rolston ultimately referred Ms. Great- *1084 house to Dr. James Tubb, a cardiothoracic surgeon, for treatment.
|nDr. Rolston testified that he was not in or near the operating room at the time of the failed intubation procedure, but that he cared for Ms. Greathouse in the time that she was hospitalized immediately prior to her death. Dr. Rolston further stated that he informed Ms. Greathouse’s family that “there had been some major brain damage that was irreversible” and that Ms. Great-house’s brain injury “was not going to be a survivable problem.”
Dr. Tubb, Ms. Greathouse’s treating cardiac surgeon, also testified at trial on behalf of the plaintiffs. Dr. Tubb testified that Ms. Greathouse’s treating cardiologist referred her to him for surgery to correct her “severe aortic stenosis.” Dr. Tubb testified that Ms. Greathouse had a history of heart disease which included “a rapid pattern of deterioration” prior to her planned surgery. He further testified that he believed corrective surgery would allow Ms. Greathouse “to live a longer period of time with a better quality of life,” and carried “probably a 3% to 4% risk factor” for complications.[5] Dr. Tubb explained the risks and benefits of the surgery to Ms. Greathouse during a series of consultations.
Dr. Tubb was approximately 20 yards away when Ms. Greathouse’s anesthesia procedure began. He testified that he was alerted to “trouble” in the operating room and entered the room as attempts were being made to ventilate Ms. Greathouse, but ultimately “they were not able to get that tube in the wind pipe to ventilate the patient at that time.” Dr. Tubb testified that although he could see blood coming from Ms. Greathouse’s mouth, “the anesthesiologist had a much better view.” Dr. Tubb testified that at some point during the roughly 30 minutes he observed the activity in the operating room, Dr. Schroeder was able to ventilate Ms. Greathouse, whereupon Ms. Greathouse’s vital signs began improving. Dr. |7Tubb further stated that by the time she was successfully intubated, Ms. Greathouse’s brain had been deprived of oxygen for “a period of 25, 30 minutes or, possibly, more.” Dr. Tubb stated that he did not recall getting “an adequate explanation from Dr. Cougle [regarding] what he thought was the cause of the bleeding.” Dr. Tubb testified that following Dr. Schroeder’s successful intu-bation of Ms. Greathouse, she was transported to the Intensive Care Unit. Dr. Tubb continued to care for Ms. Great-house, who had suffered anoxic brain damage, and “would not recover.”[6]
Dr. Joseph Trapini, the pathologist who presided over Ms. Greathouse’s autopsy report, also testified at trial regarding the autopsy he performed on Ms. Greathouse. Dr. Trapini testified that, prior to beginning Ms. Greathouse’s autopsy, he reviewed her medical records from her admission at EJGH until her death.[7] Dr. *1085 Trapini’s main finding was a large “hemorrhagic infarction” in the lower right lobe of Ms. Greathouse’s lung. According to Dr. Trapini, he “found a site that could be labeled a bleeding site, and then we did draw an opinion that this was the most likely source of the bleeding that occurred.” Dr. Trapini also testified that there were two additional abrasions in Ms. Greathouse’s airway which he described in his autopsy report. Dr. Trapini noted several times during his testimony that the autopsy he performed on Ms. Greathouse was less detailed than one that might be performed in a forensic setting. In Dr. Trapini’s words, if he had treated Ms. Greathouse’s autopsy as forensic, he “just would have been more thorough — I guess a more thorough evaluation of the area and the surrounding tissue to look for certain other findings.”
lRDr. Trapini testified that he did not observe signs of trauma in the area where the infarction in Ms. Greathouse’s right lung was found. Dr. Trapini ultimately conceded that it was “impossible to tell” what caused the bleeding in Ms. Great-house’s lungs. Dr. Trapini testified that the results of Ms. Greathouse’s autopsy did not resemble an embolic event, and no aneurism was found. He further opined that, in cases where trauma causes an injury similar to Ms. Greathouse’s, “usually, there’s a little more inflammatory component and disruption of the tissue.” However, Dr. Trapini did not exclude the possibility that a region of the lung that was not examined, the right bronchial artery, might have shown signs of trauma had it been examined. Dr. Trapini testified that the infarcted area of Ms. Great-house’s lung could have started healing while she was hospitalized in the ICU in the days prior to her death. On cross-examination, Dr. Trapini stated that if the Eschmann stylet had ruptured or tom the bronchial tissue in the lower right part of the lung, he would have seen “disruption in the inflammatory response.”
Dr. Stephen Small, an expert in anesthesiology and critical care, also testified for the plaintiffs as an expert witness. Dr. Small opined that his review of Ms. Great-house’s medical records revealed a breach in the standard of care, both with regard to Ms. Greathouse’s original intubation' procedure and with regard to the management of Ms. Greathouse’s subsequent he-moptysis.[8]
Dr. Small first testified regarding the standard of care with regard to the use of the Eschmann stylet. Dr. Small opined that there was a breach in the standard of care with regard to the use of the Esch-mann stylet and that that breach “more likely than not” contributed to Ms. Great-house’s injury and subsequent death. According to Dr. Small, the Eschmann stylet likely caused a traumatic injury to Ms. | nGreathouse’s right lung, resulting in massive hemoptysis. Dr. Small testified that due to Ms. Greathouse’s short stature, the Eschmann stylet could have easily been inserted to an inappropriate depth, resulting in trauma and bleeding in Ms. Great-house’s airway. Dr. Small opined that the coarse breath sounds heard immediately following the insertion of the Eschmann stylet was likely the onset of bleeding in Ms. Greathouse’s lungs, and the anesthesia team breached the standard of care by not investigating the cause of her abnormal breathing sooner.[9]
*1086 Further, Dr. Small testified that it was highly unlikely that Ms. Greathouse suffered a spontaneous bleed in her lungs. Dr. Small noted that Ms. Greathouse’s vital signs as documented in her medical records did not reveal a spike in blood pressure that would normally precipitate a spontaneous bleed in a patient’s lungs. In addition, Dr. Small explained that Ms. Greathouse’s echocardiogram, performed five days prior to the planned surgery, revealed no evidence of high blood pressure in her right side. Further, Dr. Small pointed out that Ms. Greathouse had only “minor” issues with pulmonary hypertension in the days leading up to her surgery, and was never formally diagnosed with or medicated for it. The volume of bleeding in Ms. Greathouse’s lungs also, according to Dr. Small, indicated an injury caused by trauma rather than a spontaneous bleed.
Dr. Small also testified that there was a breach in the standard of care with regard to Ms. Greathouse’s care subsequent to the bleed in her lungs. When asked how certain he was that the standard of care was breached in managing Ms. Greathouse’s injury, Dr. Small responded, “[w]ith a virtual certainty (sic), a hundred percent, yes, it was breached.” When asked whether that breach caused Ms. Greathouse’s injuries, Dr. Small replied, “[i]t directly caused her cardiac | marrest/brain death (sic), yes.” Dr. Small opined that if the standard of care had been followed, Ms. Greathouse, who had no prior history of lung disease, could have survived the massive hemoptys-is.
Dr. Small testified that the standard of care for a patient suffering from massive hemoptysis is threefold: first, the patient should be turned on their hemorrhaging side, second, the patient should be given 100% oxygen, and third, the two lungs should be isolated from one another to avoid contamination. Dr. Small first noted that Ms. Greathouse was never turned on her right side despite testimony that Dr. Freeman had identified a bleed in her right lung. According to Dr. Small, gravity would have prevented the left lung from being contaminated with blood and would have therefore facilitated ventilating Ms. Greathouse.
Dr. Small also testified that the methods used in the defendants’ attempt to give Ms. Greathouse oxygen were inappropriate under the circumstances and a breach in the standard of care. In Dr. Small’s opinion, the defendants’ attempts to ventilate Ms. Greathouse with an oxygen mask, a “fast-track LMA,” and jet ventilation were' useless because of the severity of Ms. Greathouse’s hemoptysis. Essentially, Dr. Small explained that the blood filling her lungs made these attempts at ventilation impossible without an endotracheal tube in place.
Finally, Dr. Small testified that if the defendants had properly isolated Ms. Greathouse’s lungs from one another, she would not have suffered the cardiac arrest that led to her brain injury and death. Dr. Small pointed out that the endotra-cheal tube that was already in place could have been used to isolate Ms. Greathouse’s left lung, enabling ventilation. Dr. Small testified that under the circumstances, it was unreasonable for Dr. Cougle to think that the endotracheal tube was blocked or otherwise dysfunctional, necessitating its removal. Dr. Small Instated that he had “no explanation” for why Ms. Greathouse’s endotracheal tube was removed, stating that “it [was] the absolute wrong thing to do.”
*1087 Dr. Small further opined that the defendants deviated from the standard of care for a patient with arterial stenosis by failing to monitor Ms. Greathouse’s blood pressure with an arterial line.[10] In addition, Dr. Small testified that it was “grossly below the standard of care” to give Ms. Greathouse high levels of Sevoflurane[11] once she was in full cardiac arrest.
Dr. Cougle testified as both a fact witness and an expert witness on behalf of himself and the other named defendants. Dr. Cougle testified that on the morning of Ms. Greathouse’s planned surgery, he was originally scheduled to work in labor and delivery but asked instead to do “the cardiac case.”[12] Dr. Cougle testified that Ms. Greathouse had “multiple problem's” including “pretty significant” pulmonary hypertension prior to her planned surgery. Dr. Cougle testified that, prior to beginning the intubation, he connected Ms. Greathouse to several monitoring devices and inserted an arterial line. Dr. Cougle testified that he then sedated Ms. Great-house and began the process of fully anesthetizing and intubating her.
According to Dr. Cougle, the Eschmann stylet was inserted by Ms. Wilkinson at the proper depth and without danger of injury to Ms. Greathouse’s lungs. Dr. Cougle recalled believing that the endotra-cheal tube was in the correct location because bilateral breath sounds and appropriate end-tidal C02 levels were observed.
Dr. Cougle testified that once Ms. Greathouse began bleeding from her mouth, the staff in the room stopped taking contemporaneous notes in her chart, 112According to Dr. Cougle, Ms. Great-house’s chart was written later based on the recollections of the people in the room and the electronic records of Ms. Great-house’s vital signs.
Dr. Cougle stated that after Ms. Great-house began to bleed from her mouth, he removed her endotracheal tube because he was unsure if his inability to ventilate was due to a clot inside the tube.. Dr. Cougle stated that he did not attempt to isolate Ms. Greathouse’s lungs from one another because he was unsure where the bleed in her lungs originated. Dr. Cougle also stated that he was afraid that turning Ms. Greathouse on her side would make it challenging to perform CPR.
Dr. Cougle recalled that Dr. Freeman entered the room and inserted a broncho-scope in an attempt to locate the . source of the bleeding. According to Dr. Cougle, “[Dr. Freeman] said that he saw what looked like bleeding from the right lung, but he couldn’t totally say that was definitive.” Dr. Cougle testified that as Dr. Freeman removed the bronchoscope, Ms. Greathouse began to go into cardiac arrest. Dr. Charles Davenport, another anesthesiologist, subsequently attempted a JELCO ventilation through Ms. Great-house’s trachea. Dr. Schroeder then entered the room and, after chest compressions were restarted, he was suddenly able to ventilate Ms. Greathouse.
Ms. Wilkinson, who also testified at trial on behalf of herself and the other named *1088 defendants, presented a version of events which largely echoed Dr. Cougle’s. Ms. Wilkinson testified that she had originally planned on allowing an anesthesiology student to assist her with Ms. Greathouse’s intubation, but decided against it because of Ms. Greathouse’s serious condition. However, Ms. Wilkinson subsequently testified that she allowed the student to insert the endotracheal tube over the Eschmann stylet in Ms. Greathouse’s throat. Ms. Wilkinson testified -that l1sshe was confident that the Eschmann stylet did not cause the alleged injury to Ms. Greathouse because, despite being unable to recall who removed the stylet, she remembered that she did not see mucus or blood on the tip. Ms. Wilkinson also testified that she was confident that the endotracheal tube was inserted in the correct location because she heard bilateral breath sounds using a stethoscope. Ms. Wilkinson opined that the “coarse” breath sounds she observed after taping the endotracheal tube in place were not indicative of the beginning of a bleed in Ms. Greathouse’s lungs. Ms. Wilkinson testified that Ms. Greathouse was exhibiting similar symptoms prior to her transfer to the operating room.
Dr. Schroeder, the anesthesiologist who was ultimately able to successfully ventilate Ms. Greathouse, also testified at trial. Dr. Schroeder recalled entering Ms. Greathouse’s operating room as Dr. Davenport “seemed to be abandoning” an attempt at “jet ventilation with a JELCO through the trachea.” According to Dr. Schroeder, the situation had been “advertised to [him] as a difficult intubation,” but he had no personal knowledge about the events preceding his attempt at intubating Ms. Greathouse.
Dr. Schroeder testified that, despite initially struggling to intubate Ms. Great-house, he was able to successfully ventilate her shortly after another member of the anesthesiology team briefly administered CPR. Dr. Schroeder testified that he believed he was able to intubate Ms. Great-house shortly after commencing CPR because the movement of her chest during CPR dislodged a blood clot in her left lung which had been blocking the orifice of the left main stem bronchus. Dr. Schroeder also testified that he believed that he saw Ms. Greathouse hooked up to an arterial line, because he “[couldn’t] believe” that she would not have had an arterial line in at the time of her intubation. On cross-examination, he elaborated, stating that “protocol definitely included starting an [arterial] line on the 114anesthetized or the unanesthetized patient.” Dr. Schroeder also recalled Ms. Wilkinson attempting to ventilate Ms. Greathouse using “an oral airway and a mask.”
Dr. Emily Donaldson, a board certified anesthesiologist and member of the medical review panel, testified as an expert witness for the defendants. Dr. Donaldson’s initial testimony focused on Ms. Greathouse’s “poor health” and her risk factors for undergoing the planned surgery. Dr. Donaldson subsequently read the entirety of the Medical Review Panel Opinion out loud before the jury. Dr. Donaldson testified that she did not believe that the Eschmann stylet caused injury to Ms. Greathouse’s lung because she saw no evidence of traumatic injury in the autopsy report prepared by Dr. Trapini. On cross-examination, however, Dr. Donaldson conceded that an injury caused by the Eschmann stylet was “a possible cause” with regard to Ms. Greathouse’s injuries. Dr. Donaldson opined that the massive hemoptysis suffered by Ms. Great-house was especially critical because her cardiopulmonary system was “very weak” and “in a very short amount of time things can go from marginally okay to very, very badly.” Dr. Donaldson also testified that there would be “no guarantee” that an *1089 attempt to isolate Ms. Greathouse’s left lung would have been successful or resulted in a different outcome. She noted that the short time span within which Ms. Greathouse’s condition deteriorated made it unlikely that isolating her left lung would have saved her life.
Dr. Neil Anand also testified for the defendants as an expert in Cardiothoracic Anesthesiology. Dr. Anand testified that in an x-ray taken of Ms. Greathouse’s chest following her transfer to the ICU, he saw evidence that there was no blood in her left lung and that her left lung was therefore properly ventilated during the entirety of her time in the operating room and the ICU. L ..¡According to Dr. Anand, it “appeared” to him that “within five minutes” the team was able to “re-establish the heart (sic).” Dr. Anand testified that the efforts of the defendants “absolutely” met the standard of care. However, on cross-examination, Dr. Anand struggled to explain the conflicting evidence in Ms. Greathouse’s medical records regarding whether or not she was properly ventilated during her time in the operating room.
After deliberating, the jury returned a verdict in favor of the defendants, finding that none of the defendants breached the standard of care. The jury, therefore, did not reach the jury verdict form’s subsequent questions regarding causation and damages. On November 18, 2018, the trial court adopted the jury verdict as the judgment of the court. This timely appeal follows.
DISCUSSION

Medical Review Panel Opinion

The plaintiffs allege that the trial court erred in admitting the Medical Review Panel Opinion in its entirety and un-re-dacted over the plaintiffs’ objections. The plaintiffs’ assignment of error with regard to the Medical Review Panel Opinion is composed of two distinct complaints, which we will discuss in turn. First, the plaintiffs argue that the Medical Review Panel Opinion should have been redacted with regard to the amount ■ of time that Ms. Greathouse spent deprived of oxygen following the failed intubation. Second, the plaintiffs argue that the Medical Review Panel Opinion should have been redacted with regard to its statement concerning Ms. 'Greathouse’s informed consent to her planned surgery.
hr,For the reasons that follow, we find that the trial court committed a prejudicial error of law by admitting the un-redacted Medical Review Panel Opinion, necessitating reversal of the jury’s verdict and remand to the district court for a new trial.
The Medical Review Panel listed seven reasons for its conclusion, only two of which are germane to the plaintiffs’ appeal:
1. The medical records indicate that a consent form was signed by the patient, and risks for anesthesia were discussed with the patient.
[[Image here]]
7. Upon the patient’s arrest, the anesthesia team took out the endotracheal tube in an attempt to rule out a blood clot plugging up the tube. The endotracheal tube was replaced successfully four (4) minutes after removal, not 11 or 12 minutes as indicated in other areas of the patient’s chart.

Standard of Review

A party may not complain on appeal about an evidentiary ruling in the trial court unless the trial judge was given the opportunity to avoid the perceived error, and the ruling “affected” a “substantial right” of the party. Trascher v. Territo, 11-2093 (La.05/08/12), 89 So.3d 357, 362, see also La. C.E. art. 103(A)(1). The appellate court must consider whether the *1090 particular evidentiary ruling complained of was erroneous, and if so, whether the error prejudiced the complainant’s case, with reversal warranted only if the error prejudiced the complainant’s case. Willis v. DeMelo, 14-427, La.App. LEXIS 2477 (La.App. 5 Cir. 10/15/14).
Prior to trial, the plaintiffs filed a motion in limine to exclude evidence regarding whether Ms. Greathouse had given informed consent to her anesthesia and planned surgery. The plaintiffs based their motion on two arguments. First, they argued that Ms. Greathouse’s consent to the anesthesia was invalidly obtained under Louisiana law because her consent form indicated that Dr. Freeman, not Dr. h7Cougle, would be her attending anesthesiologist.[13] Second, the plaintiffs argued that evidence of Ms. Greathouse’s informed consent to her planned surgery was irrelevant and prejudicial with regard to the failed anesthesia procedure, which occurred before her planned surgery could take place. After a hearing on the matter, the trial court denied the plaintiffs’ motion on the basis that any confusion regarding informed consent could be handled at trial and using proper jury charges.
The plaintiffs subsequently filed a second motion in limine, requesting that the trial court exclude the Medical Review Panel Opinion in its entirety. In support of this motion, the plaintiffs argued that the Medical Review Panel Opinion contained impermissible fact finding and determinations of credibility made in violation of the Louisiana Medical Malpractice Act. The plaintiffs argued that the Medical Review Panel’s reason number 7 for its opinion (which discussed the length of time it took to successfully re-intubate and ventilate Ms. Greathouse) impermissibly chose to credit a portion of the medical records favorable to the defendant while discrediting other unfavorable portions of the records, thereby resolving a factual issue that should have been left for trial. The trial court denied the motion, agreeing with the defendants that the medical review panelists, as medical experts, were entitled to review and interpret the patient’s medical records. The trial court further stated that, as with other expert testimony, the jury could find that the medical review panelists’ factual determinations were incorrect and “disregard the opinion.”

The Medical Review Panel’s Improper Finding of Fact

Because we find that the admission of the Medical Review Panel’s factual finding that Ms. Greathouse was successfully re-intubated in four minutes liSmandates reversal, we will address this issue first. Medical Review Panel Opinions are limited in scope by both statutory and jurisprudential authority. The Louisiana Legislature enacted the MMA in 1975 in response to a perceived crisis within the state caused by prohibitive medical malpractice insurance costs. McGlothlin v. Chnstus St. Patrick Hosp., 10-2775, p. 7 (La.7/1/11), 65 So.3d 1218, 1225. Under the MMA, qualified healthcare providers cannot be sued for medical malpractice unless the plaintiff has submitted a complaint to a Medical Review Panel, composed of three healthcare providers and one attorney chairperson. La. R.S. § 40:1299.47(B)(i)(a)(i); McGlothlin, 65 So.3d at 1225. According to the MMA, the Panel’s “sole duty” is “to express its expert opinion as to whether or not the evidence supports the conclusion that the ... defendants acted or failed to act within the appropriate standards of care.” La. R.S. § 40:1299.47(G). In performing its duty, the Panel is not permitted to render an opinion on any disputed issue of materi *1091 al fact that does not require their medical expertise. McGlothlin, 65 So.3d at 1229. Further, the MMA specifically states that “[a]ny report of the expert opinion of the medical review panel shall be admissible as evidence in any action subsequently brought by the claimant in a court of law[.]” La. R.S. § 40:1299.47(H). However, as with any other expert testimony, the Medical Review Panel Opinion is subject to review and a trial court may reject it as inadmissible. McGlothlin, 65 So.3d at 1227.
The duty of a trial court to exclude factual findings from the Medical Review Panel Opinion has been explicitly recognized by the Louisiana Supreme Court. In McGlothlin, supra, the Supreme Court considered a medical malpractice action wherein the Medical Review Panel Opinion contained a similar impermissible finding of fact. In that case, the trial court redacted the offending language and admitted the rest of the Opinion into evidence. McGlothlin, 65 So.3d 119at 1224. At trial, the jury found the defendants not liable for the plaintiffs injuries. Id. The Third Circuit reversed the trial court, finding that the entire Medical Review Panel Opinion should have been excluded from consideration by the jury. Id. at 1225. On appeal from the Third Circuit, the Supreme Court found that the trial court had acted properly by redacting the inappropriate factual findings from the Opinion, and re-instated the trial court’s verdict. Id. at 1236.
In McGlothlin, the Louisiana Supreme Court framed the issue as whether “a medical review opinion is admissible when the panel exceeds its statutory duty and renders an opinion based on its decision to credit the evidence presented by one party over another.” Id. at 1225. The Court explained that when a matter before the Panel presents a “material issue of fact, not requiring an expert opinion, bearing on liability,” as described by La. R.S. § 40:1299.47(G), the MMA requires the panel to “simply acknowledge the material issue and defer to the factfinder’s consideration.” McGlothlin, 65 So.3d at 1229. Specifically, “the panel is not permitted to render an opinion on any disputed issue of material fact that does not require their medical expertise.” Id. at 1229 (emphasis added).
In this case, as in McGlothlin, we find that the Medical Review Panel Opinion contained an impermissible finding of material fact which should have been excluded from consideration by the jury. Both Dr. Cougle and Ms, Wilkinson testified at trial that Ms. Greathouse’s chart was not written contemporaneously with the events they described, and that Ms. Wilkinson recreated the chart to the best of her ability based, in part, on her personal recollections of what occurred in Ms. Great-house’s operating room.[14] Therefore, the interpretation of the timing of events leading up to Ms. Greathouse’s death was not a matter of expert opinion, but was instead a finding of fact.
lanAt trial, several witnesses offered divergent accounts of how long Ms. Great-house was deprived of oxygen before being successfully intubated and ventilated by Dr. Schroeder. At his deposition, Dr. Tubb testified that Ms. Greathouse was without oxygen for “in excess of 8 to 10 minutes.” At trial, he stated that Ms. Greathouse may have been deprived of oxygen as long as 30 minutes. In his deposition, Dr. Cougle stated that Ms. *1092 Greathouse was without oxygen for approximately twelve minutes, while at trial he stated that he did not know how long she was without oxygen. Dr. Small testified that he agreed with Dr. Cougle’s initial assessment that Ms. Greathouse spent approximately twelve minutes deprived of oxygen.[15] Dr. Trapini’s pathology report stated that Ms. Greathouse spent 12 minutes without oxygen, although at trial Dr. Trapini was unable to recall making that finding. Dr. Anand was unable to precisely define how long Ms. Greathouse was without oxygen. In summary, the question of how long Ms. Greathouse was deprived of oxygen was a disputed factual issue throughout the litigation and trial in this matter. Both fact and expert witnesses disagreed on the interpretation of Ms. Greathouse’s chart and other medical records, which could be read without any medical expertise. Thus, we find that the Medical Review Panel Opinion contained an impermissible finding regarding a disputed material fact.
We further find that the trial court’s error prejudiced the plaintiffs’ case, warranting reversal. Willis, supra. In this case, the length of time that Ms. Greathouse was deprived of oxygen was a material fact which substantially affected the outcome of the case. One of the plaintiffs’ two malpractice claims in this action was that the defendants committed malpractice in the management of Ms. Great-house’s care once her massive hemoptysis began. Whether or not the |2i defendants made appropriate efforts to ventilate Ms. Greathouse and avoid her later brain injury and death is directly related to how long those efforts took place. This finding is directly relevant to both the question of breach of the standard of care and the issue of causation. Therefore, the jury’s finding that the defendants did not violate the standard of care with regard to either Ms. Greathouse’s intubation or the management of her subsequent care can be directly linked to this error. Accordingly, we find that the trial court committed a prejudicial error of law by admitting the Medical Review Panel’s finding regarding the amount of time Ms. Greathouse was deprived of oxygen, and that this error mandates reversal of the jury’s verdict.

Informed Consent

The plaintiffs also allege that the trial court erred in admitting the Medical Review Panel’s conclusion with regard to Ms. Greathouse’s informed consent. The plaintiffs’ petition originally included a claim against the defendants for lack of informed consent based on the premise that Ms. Greathouse’s consent was obtained by Dr. Freeman, and not Dr. Cou-gle, who ultimately performed the procedure. However, the parties stipulated prior to trial that informed consent would not be at issue in this case. The plaintiffs contend that the Panel’s finding concerning informed consent was not probative of any material fact in this case, and further allege that the issue of informed consent was inherently confusing and prejudicial to the jury. We agree that the trial court erred in admitting the Medical Review Panel’s conclusion with regard to Ms. Greathouse’s informed consent. We need not reach the question of whether admitting this conclusion, in isolation, constitutes reversible error. However, we find that this error, in conjunction with ^the trial court’s failure to instruct the jury on loss of chance of. survival, mandates reversal.
*1093 The plaintiffs argue that evidence of Ms. Greathouse’s informed consent was wholly irrelevant to the issues litigated at trial. We agree. Louisiana Code of Evidence article 401 defines “relevant evidence” as “evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” Generally speaking, though subject to numerous exceptions, all relevant evidence is admissible, and irrelevant evidence is inadmissible. La.Code Evid. art. 402. As discussed above, the plaintiffs- stipulated that informed consent would not be at issue at trial. Although the question of informed consent was properly before the Medical Review Panel at the time it rendered its opinion, it was not relevant to the jury’s determination at trial. Therefore, any evidence regarding Ms. Greathouse’s informed consent was irrelevant and should have been excluded from consideration by the jury.
We agree with the plaintiffs that the introduction of evidence regarding Ms. Greathouse’s informed consent to her planned surgery also presented a danger of jury confusion. Although other jurisdictions have regularly addressed whether evidence regarding informed consent might prejudice a jury when informed consent is not at issue at trial,[16] Louisiana appellate courts have not substantively addressed this issue.
We decline to.opine as to whether irrelevant evidence of informed consent in a medical malpractice action is per se prejudicial. However, in this case, the danger of jury confusion was especially acute because of the factual issues which ^predominated at trial. The defendants repeatedly highlighted the dangers inherent in Ms. Greathouse’s planned surgery, particularly in light of her deteriorated condition, and equated those risks to the risks of her intubation.[17] This link could easily lead to the conclusion that Ms. *1094 Greathouse acquiesced to her injury and subsequent death. Accordingly, we find that, under La.Code Evid. art. 401 and 402, the trial court erred in failing to redact the conclusion of the Medical Review Panel regarding informed consent.
Jury Instruction on Lossk of Chance of Survival
In their first assignment of error, Plaintiffs allege that the trial court erred in excluding from its jury instructions an explanation of Louisiana law on the loss of chance of survival in a medical malpractice action. We agree.
In order to address the plaintiffs’ first assignment of error, we must first discuss the role that the loss of chance of survival plays in a medical malpractice claim. To prevail on a medical malpractice claim, a plaintiff must prove three elements: (1) the standard of care applicable to the healthcare provider defendant, (2) a breach of that standard of care, and (3) that the breach of the standard of care caused the plaintiff to suffer injuries. See La. R.S. § 9:2794(A); Pfiffner v. Correa, 94-0924, 94-0963, 94-0992 (La.10/17/94), 643 So.2d 1228, 1232; Byrd v. State ex rel. Dept. of Pub. Safety & Corr., 93-2765 (La.5/23/94), 637 So.2d 114, 121; Mladenoff v. La. Med. Mut. Ins. Co., 13-477 (La.App. 5 Cir. 3/26/14), 139 So.3d 8, 11, writ denied, 14-0862 (La.6/20/14), 141 So.3d 813.
Loss of chance of survival is a legal doctrine which governs the third element of a medical malpractice action when the alleged malpractice results in a patient’s death. Under Louisiana law, a plaintiff in a medical malpractice action is not required to prove that a healthcare provider directly caused their patient’s death. Hastings v. Baton Rouge Gen. Hosp., 498 So.2d 713, 721 (La.1986). Rather, the plaintiff need only prove that the defendant’s malpractice resulted in the patient’s losing a chance of survival. The loss of chance of survival doctrine is intended to prevent medical malpractice plaintiffs from bearing.the “unreasonable burden” of proving that the' patient would have survived if properly treated. Martin v. East Jefferson Gen. Hosp., 582 So.2d 1272, 1278 (La.1991).
Thus, in a case in which the patient has died, once a plaintiff proves that a healthcare provider breached his or her duty to the patient, constituting malpractice, the question then becomes “whether the malpractice contributed to the [patient’s] death, i.e., lessened the chance of survival.... ” Hastings v. Baton Rouge Gen. Hosp., supra at 713.
On appeal, the defendants assert that “loss of chance of survival is not recoverable as an element of damage in either a wrongful death or survival action,” citing the Louisiana Supreme Court decision of Smith v. State, Dep’t of Health & Hospitals, 95-0038 (La.6/25/96), 676 So.2d 543, 547. The defendants assert that “therefore, the [pjlaintiffs simply cannot rely on their claims for wrongful death or LnSurvival damages for a valid loss of chance of survival claim.”[18] However, the defendants misconstrue Smith. The Smith court was faced with determining the measure of damages for loss of chance of survival, not whether loss of chance of *1095 survival had to be specifically pled as an additional element to a wrongful death or survival claim. Id. at 546. In Smith, the Supreme Court, upholding the Second Circuit’s previous finding that the plaintiff could recover for loss of chance, of survival, held that loss of chance of survival was a “distinct compensable injury” for the purpose of calculating damages. Id. at 547. Smith does not stand for the proposition that plaintiffs in a wrongful death or survival action are prohibited from supporting their theory of recovery with regard to causation using the loss of chance of survival doctrine. Instead, Smith revolves around the method of calculating damages in a case where a plaintiff claims loss of chance of survival. Accordingly, it is irrelevant to the defendants’ argument in this case.
Further, “it is well established that Louisiana is a fact pleading state.” Solis v. NPK, L.L.C., 10-465 (La.App. 5 Cir. 03/29/11), 68 So.3d 236, 238. Accordingly, a plaintiff in Louisiana is entitled to recover any relief to which he or she is entitled under the pleadings and the evidence. Absent special circumstances, “courts should construe pleadings so as to achieve substantial justice and in order to reach the truth, should avoid the application of harsh, technical rules of pleading.” Id. at 238. Therefore, we find that the fact that the plaintiffs in this case did not specifically plead loss of chance of survival to be irrelevant to our analysis.

|2fiStandard of Review

Louisiana Code of Civil Procedure article 1792(B) requires the trial court to instruct jurors on the law applicable to the cause submitted to them. Under Louisiana law, “an appellate court must exercise great restraint before it reverses a jury verdict because of erroneous jury instructions.” Adams v. Rhodia, Inc., 07-2110 (La.05/21/08), 983 So.2d 798, 804. Because trial courts are vested with broad discretion in formulating jury instructions, a trial court judgment should not be reversed so long as the charge correctly states the substance of the law. Id. However, when a trial court erroneously instructs the jury and the error “probably contributed to the verdict,” an appellate court must reverse the: verdict. Id. The seminal question is whether the jury instructions misled the jury to the extent that it was unable to dispense justice. Id., citing Nicholas v. Allstate Insurance Company, 99-2522, p. 8 (La.8/31/00), 765 So.2d 1017, 1023.
In the present case, the trial court specifically excluded any instruction to the jurors on the loss of chance of survival.[19] Further, loss of chance of survival was applicable in the case at bar because of the plaintiffs’ claim that Ms. Greathouse died as a result the defendants’ alleged malpractice. In addition, two of the defendants’ experts explicitly testified that Ms. Greathouse probably would have died following her massive hemoptysis despite any efforts at isolating her functioning lung.[20] Therefore, the trial court failed to include in its jury instructions an “applicable, essential legal principle” that should have *1096 been applied to the facts of the case. See Adams, 983 So.2d at 804. Accordingly, we find that the trial court erred in omitting the jury instruction on loss of chance of survival.
|27As discussed above with regard to evidence of Ms. Greathouse’s informed consent, we decline to opine as to whether the trial court’s refusal to instruct the jury on lack of chance of survival, in isolation, constitutes reversible error. However, in this case, in which evidence of Ms. Great-house’s advanced age and declining health was a persistent theme throughout trial, we find that the trial court’s failure to instruct the jury on loss of chance of survival probably contributed to the jury’s verdict. This prejudicial error, together with the admission of the portion of the Medical Review Panel Opinion addressing informed consent, contributed to the verdict to the extent that the jury was unable to dispense justice, mandating reversal of the jury’s verdict.

Refreshment of Dr. Tubb’s Memory Using Deposition Testimony

In their final assignment of error, the plaintiffs argue that the trial court erred in refusing to allow plaintiffs’ counsel to refresh Dr. Tubb’s memory with his prior deposition testimony. When the defendants objected to the plaintiffs’ request to introduce Dr. Tubb’s deposition to refresh his recollection, they raised two points: first, whether a deposition may be used to refresh a witness’s recollection at all, and second, whether the portion of Dr. Tubb’s deposition that the plaintiffs sought to show him presented an additional foundation and hearsay issue. For the reasons that follow, we find that the trial court erred in refusing to allow plaintiffs’ counsel to refresh Dr. Tubb’s memory with his prior deposition testimony. As to the defense’s second objection, we find that the trial court ruled prematurely in finding that refreshing Dr. Tubb’s recollection would result in eliciting inadmissible hearsay testimony. Therefore, the trial court erred in sustaining the defendants’ second objection based on their argument as to hearsay.
|2SIn this case, the plaintiffs were seeking to refresh Dr. Tubb’s memory regarding a statement he made during his prior deposition. At his deposition, Dr. Tubb stated:
I do know that Dr. Cougle thought that the Eschmann tube had caused bleeding and this is what he thought was the cause of their inability to ventilate this patient was blood in the tracheobronchial tree.
At trial, Dr. Tubb testified during direct examination that he had a conversation with Dr. Cougle after Ms. Greathouse’s failed anesthesia procedure. Plaintiffs’ counsel asked Dr. Tubb if, during that conversation, he asked Dr. Cougle what Dr. Cougle thought happened during the procedure to cause Ms. Greathouse’s injuries. Plaintiffs’ counsel was attempting to elicit whether Dr. Cougle thought the Eschmann stylet caused Ms. Greathouse’s hemoptysis. Dr. Tubb testified that “the gist” of what Dr. Cougle said was simply that he “couldn’t ventilate the patient.” Further, Dr. Tubb testified, “I don’t think I ever got an adequate explanation from Dr. Cougle what he thought was the cause of the bleeding (sic).” Following this statement, plaintiffs’ counsel sought to refresh Dr. Tubb’s recollection with his previous deposition testimony.
Defense counsel first objected on the grounds that depositions cannot be used to refresh a witness’s recollection, stating that depositions could only be used for impeachment. The trial court overruled this objection, stating that plaintiffs’ counsel could use the deposition testimony to refresh Dr. Tubb’s memory. Defense *1097 counsel then objected on the grounds that the deposition testimony would lead Dr. Tubb to testify to hearsay or matters about which he lacked personal knowledge. Initially, plaintiffs’ counsel believed the deposition to state that “Dr. Cougle told [Dr. Tubb] he thought it was the Eschmann[.]” (emphasis added). Though the deposition testimony did not actually say that Dr. Cougle specifically told Dr. Tubb that he thought the Eschmann injured Ms. Great-house, plaintiffs’ |Mcounsel considered this to be a “fair inference” from the testimony. The trial court disagreed, finding it improper to allow plaintiffs’ counsel to show Dr. Tubb his deposition testimony before determining whether he had personal knowledge of the facts about which he was to testify. Specifically, the court explained, “[I]f this said ‘Dr. Cougle told me that the Eschmann tube had caused the bleeding,’ I would let you do it in a second. But it doesn’t say that.” Ultimately, plaintiffs’ counsel conceded that if Dr. Tubb learned what Dr. Cougle considered to be the cause of Ms. Greathouse’s injuries from a third person who did not testify at trial, the statement would constitute inadmissible hearsay.
Following the trial court’s instructions, plaintiffs’ counsel then attempted to lay the proper foundation for refreshing Dr. Tubb’s recollection with the specifics of any alleged conversation between him and Dr. Cougle as follows:
Q: Just for the record, Dr. Tubb, did you ever have a conversation with Dr. Cou-gle about the Eschmann tube?
A: I, I, I would not be accurate saying that I remembered a specific conversation about the Eschmann tube with Dr. Cougle.
Q: Or the use of it, you know, before?
A: No, I do not recall having a direct conversation with Dr. Cougle, vis-a-vis, in regards to the Eschmann tube.
Q: Can you tell us, then, what the gist of the conversation was that you did have with him in the operating room?
A: I asked him why the patient was not being ventilated ... and I got no adequate explanation as to why the patient couldn’t be ventilated.
Q: When you say no “adequate” explanation, did he give you any? Did he say anything, or have any explanation, at all?
A: No.
Q: No. Did you have any further conversation with him in the operating room that day?
A: Not to my recollection.
IsnQ: Did you have any further conversations with him subsequent to that time?
A: Not that I would recall with enough clarity to state.

Standard of Review

The appellate court must consider whether the particular evidentiary ruling complained of was erroneous,- and if so, whether the error prejudiced the complainant’s case, with reversal warranted only if the error prejudiced the complainant’s case. Willis, supra.
As to the defendants’ first objection, both the Louisiana Code of Evidence and the Louisiana Code of Civil Procedure explain when and how a deposition may be introduced to refresh a witness’s recollection and/or impeach his testimony. Louisiana Code of Evidence article 612 provides, “In a civil case, any writing, recording, or object may be used by a witness to refresh his memory while testifying. If a witness asserts that his memory is refreshed, he must then testify from memory independent of the writing, recording, or object.” La.Code Evid. art. 612(a). Though the plain language of the article seems to clearly indicate that any *1098 writing, and no writing in particular, maybe used to refresh a witness’s recollection while testifying, comments to article 612 provide further guidance. First, comment (a) indicates that this Article “permit[s] a witness to refresh his memory by examining a writing, recording or object regardless of when and by whom it was prepared.” La.Code Evid. art. 612 cmt. (a). Second, comment (c) explains that “the terms ‘writing,’ ‘recording,’ and ‘object’ are used in preference to ‘memorandum’ to avoid any suggestions that the item must be a formal document. These terms should be given their broadest meaning, and include sound,, recordings, pictures, and the like.” La.Code Evid. art. 612 cmt. (c) (emphasis added). Therefore, we find that the clear language of Louisiana Code of | Si Evidence article 612 permits the use of deposition testimony to refresh the memory of a witness at trial, regardless of the deposition testimony’s ultimate admissibility at trial. Accordingly, we find that the trial court erred in failing to allow plaintiffs’ counsel to refresh Dr. Tubb’s memory using his prior deposition testimony.
As to the trial court’s ruling on the defendants’ second objection, we find that the trial court ruled prematurely in sustaining the defendants’ objection that refreshing Dr. Tubb’s memory would result in eliciting inadmissible hearsay testimony. “ ‘Hearsay’ is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted.” La.Code Evid. art. 801(C). Hearsay is generally inadmissible because the “value of the statement rests on the credibility of the out-of-court as-serter who is not subject to cross-examination and other safeguards of reliability.” Trascher, 89 So.3d at 364; see La.Code Evid. art. 802.
In this case, the plaintiffs were seeking to remind Dr. Tubb that he knew “that Dr. Cougle thought that the Eschmann tube had caused bleeding” because Dr. Cougle told him so. In that scenario, the statement would not have constituted hearsay. Under Louisiana Code of Evidence article 801(D)(2)(a), a party’s own statement offered against him is not considered hearsay. Further, a prior statement by a witness who testifies at trial and’ is subject to cross-examination is not considered hearsay. La.Code Evid. art. 801(D)(1)(b). On the other hand, if Dr. Tubb’s deposition testimony was based on the statement of a third party who did not testify at trial, that statement would be hearsay and therefore inadmissible at trial.
Because plaintiffs’ counsel was precluded by the trial court from refreshing Dr. Tubb’s memory regarding his prior testimony, the trial court had no basis upon which to determine whether the statement in question was in fact hearsay. | ^Therefore, the trial court erred in its second and premature ruling. However, this ruling, in isolation, did not prejudice the plaintiffs in this matter. The jury heard a large volume of evidence concerning the possible causes of Ms. Greathouse’s hemoptysis, and it is unlikely that the refreshment of Dr. Tubb’s memory with his prior deposition testimony would have resulted in a different verdict.
DISPOSITION
We find that the admission of the unredacted Medical Review Panel Opinion constituted a prejudicial error of law, necessitating our de novo review of the record. Generally, the question of whether a health care provider’s conduct fell below the applicable standard of care is a factual determination and is thus subject to the manifest error standard of review. See Martin v. East Jefferson Gen. *1099 Hosp., 582 So.2d 1272 (La.1991). However, “[w]hen the jury is tainted by incorrect and prejudicial instructions or rulings on admissibility of evidence in a tort case, the jury’s liability decision is'not entitled to any deference, and the appellate court decides the case on the record without according any weight to the jury’s liability decision.” Andrus v. State Farm Mut. Auto. Ins. Co., 95-0801, p. 10 (La.3/22/96), 670 So.2d 1206, 1211. Legal errors are considered prejudicial when they materially affect the outcome of the litigation. Johnson v. Spurlock, 07-949 (La.App. 5 Cir. 05/27/08), 986 So.2d 724, 728. When such an error occurs, the appellate court will, if possible, apply the correct principles of law, determine the material facts, and render a proper judgment on the record. Id.
As stated above, when an appellate court finds legal error in a judgment and the record is complete, it usually conducts an independent review and judgment is rendered on the merits. However, when the weight of the evidence is so nearly equal that a first-hand view of witnesses is essential to a fair resolution of the | ^issues, the appellate court must decide whether it can fairly find a preponderance of the evidence from the cold record. In cases where a view of the witnesses is essential to a fair resolution of conflicting evidence, the case should be remanded for a new trial. DOT & Dev. v. Monteleone, 07-459 (La.App. 5 Cir. 02/06/08); 976 So.2d 798, 802; Jones v. Black, 95-2530 (La.6/28/96), 676 So.2d 1067; Ragas v. Argonaut Southwest Ins. Co., 388 So.2d 707, 708 (La.1980); Gonzales v. Xerox Corp., 254 La. 182, 320 So.2d 163, 165 (1975).
In this ease, we find that due to the complex factual narrative of Ms. Great-house’s medical history and treatment at EJGH, the determination of the defendants’ liability precludes our determination of liability from a cold record. Accordingly, we reverse the jury’s verdict and remand for a new trial.

REVERSED AND REMANDED

.An Eschmann stylet is a long, flexible, tubular instrument which guides the insertion of an endotracheal tube during difficult intuba-tions. The endotracheal tube, once guided into place, is used to ventilate a patient when her lungs are incapacitated. In this case, Ms. Greathouse's lungs were initially incapacitated due to the anesthetics needed to prepare her for surgery.

. The length of Ms. Greathouse’s oxygen deprivation was disputed trial.

. See La. R.S. § 40:1299.47.

. Two of Ms. Greathouse’s children testified at trial. James Greathouse testified that following a recent back surgery, his mother was generally active and in good health prior to the planned surgery. Mr. Greathouse stated that he was with his mother on the morning of her planned surgery. According to Mr. Greathouse, following the unsuccessful intu-bation attempt, CRNA Wilkinson told him, ”[i]t was an easy airway. I don’t know what happened.”
Terre Matranga, Ms. Greathouse’s daughter, also testified at trial. Ms. Matranga testified that she has worked as a nurse anesthetist for over thirty years. She discussed her mother's recent successful back surgery, which had rendered Ms. Greathouse significantly more active and mobile in the year prior to her death. Ms. Matranga stated that in the year before her death, Ms. Greathouse had been in generally good health and high spirits. According to Ms. Matranga, Ms. Greathouse began complaining of shortness of breath and chest pain in the weeks leading up to the surgery. Ms. Matranga echoed her brother's testimony regarding the events on the day of Ms. Greathouse’s surgery, including Ms. Wilkinson’s comment to the effect of, "I don't understand what happened ... [y]our mother had a very easy airway.” Ms. Matranga also testified that, several days after her mother entered the ICU, Ms. Wilkinson "came into the ICU area” and told Ms. Ma-tranga that she "thought from the very beginning that [Ms. Greathouse] had a very difficult airway so I just pulled out an Eschmann (sic).” Other than Ms. Wilkinson's comment, Ms. Matranga testified that no one from Parish Anesthesia ever explained what caused her mother's injuries. Ms. Matranga expressed dissatisfaction with the Medical Review Panel and explained that her dissatisfaction led her to ultimately pursue litigation against the defendants in this case.

. On cross-examination, Dr. Tubb stated that there was a possibility that Ms. Greathouse's ascending aorta would need to be replaced. This determination would have taken place at the time of surgery. Accordingly, the risk quoted to Ms. Greathouse during her consultation with Dr. Tubb was closer to 15%.

. Dr. Mark Henson, medical director of anesthesia at EJGH, also testified for the plaintiffs by way of his deposition. It was unclear from the trial transcript which portions of Dr. Henson’s deposition were presented to the jury. Dr. Henson was not in Ms. Greathouse’s operating room at the time of her failed intubation. His deposition testimony focused primarily on the hospital’s response to Ms. Greathouse's injury and subsequent death.

.Dr. Trapini testified that, shortly following Ms. Greathouse’s death, Dr. Tubb visited with him, and that Dr. Tubb was “concerned and wanted to know what happened.” Otherwise, Dr. Trapini stated that he did not speak to any *1085 of the doctors or nurses who had cared for Ms. Greathouse regarding her failed intubation.

. Hemoptysis is the clinical term for a bleed in the lungs which exits through a patient’s mouth.

. Contrary to Ms. Wilkinson's testimony, Dr. Small pointed out that Ms. Greathouse’s *1086 breath sounds were not coarse in her preoperative evaluation, indicating a change in her condition contemporaneous with the insertion of the Eschmann stylet.

.There was contradicting testimony by the fact witnesses testifying for the plaintiffs, who all stated that Ms. Greathouse was in fact connected to an arterial line. However, Dr. Small did not see the use of an arterial line indicated in Ms. Greathouse’s medical records.

. Sevoflurane is an anesthetic gas which causes a drop in blood pressure and unconsciousness.

. Dr. James Freeman was the anesthesiologist originally assigned to Ms. Greathouse’s surgery. Dr. Freeman was also the doctor who obtained Ms. Greathouse’s informed consent.

. See La. R.S. § 40:1299.40(B)(7)(c)(i).

. Dr. Mark Henson, chief of anesthesia at EJGH, also made similar statements at his deposition, confirming this account of how Ms. Greathouse’s medical chart was prepared.

. Specifically, Dr. Small testified that based on the materials he reviewed, he believed that Ms. Greathouse spent "probably between 10 and 15 minutes” without oxygen.

. See e.g.: Wright v. Kaye, 267 Va. 510, 528-529, 593 S.E.2d 307 (2004), where the Virginia Supreme Court held that "evidence of information conveyed to [a patient] concerning the risks of surgery in obtaining her consent is neither relevant nor material to the issue of the standard of care.” See also Schwartz v. Johnson, 206 Md.App. 458, 49 A.3d 359 (2012); Warren v. Imperia, 252 Or. App. 272, 287 P.3d 1128 (2012).

. Dr. Donaldson in particular discussed the risks of Ms. Greathouse's surgery at length, stating:
The surgery, itself, is very, very involved. It was an involved surgery for someone who is otherwise healthy, if that were ever to have occurred. I know that someone that's healthy would not have the surgery, but it’s still a big insult to the person. And so, of course, with a lot of co-morbidities, whatever they may be diabetes (sic), high blood-pressure, the renal insufficiency, all of that increases your risk for poor outcome even in minor surgery, but particularly in major surgery.
Dr. Anand also stated that, "[Ms. Great-house] had multiple co-morbidities or diseases that, basically, put her in a very poor state of health. She would have been considered by me, or other colleagues that I work with, in a — in a very risky high risk for surgery — for cardiac surgery.” He continued, "people like Mrs. Greathouse, you know, who are in an Intensive Care Unit, that’s — She's 80 years old. She’s very sick, so it’s very hard to pull a patient like that through heart surgery the second time, especially, a second time.”
Dr. Cougle’s attorney also referenced the risks of Ms. Greathouse's planned surgery during opening argument stating:
[Ms. Greathouse] got a consult from Dr. Tubb, who’s a cardiovascular surgeon, who said, "Well, your options aren't good. We can let you go. We can attempt to do surgery, but this surgery,” as you will hear, "is a very, very high-risk surgery. If you want to do it, there’s a chance of 15% or greater that you won’t live through the sur-geiy because that’s how risky it is.”

. The defendants also allege that a loss of chance of survival claim requires that the plaintiff suffer a "preexisting condition," citing a second circuit decision. Clark v. City of Shreveport, 31,407 (La.App. 2 Cir. 01/20/99); 726 So.2d 1042. Clark does not support the defendants’ arguments. In fact, Clark focuses on loss of chance of survival as an aspect of causation in a medical malpractice claim. Further, the evidence reflects Ms. Greathouse clearly suffered from a pre-existing condition at the time of the alleged malpractice, both in terms of her heart disease and her status as a surgical patient at EJGH.

. Counsel for the plaintiffs timely objected to the jury charges, stating that, by excluding the instruction on loss of chance of survival, the trial court was holding the plaintiffs to an improper standard of proof.

. According to Dr. Anand, ‘‘[mjost hemop-tysbs eventually end up. in death anyway, whether you do something or not.” Dr. Donaldson similarly testified that, "the significance of cardiac arrest in this patient are that your likelihood of having a good outcome, even with prompt and appropriate resuscitation, are low (sic).”